LAW OFFICES OF ROBERT V. CORNISH, JR., P.C.
Hadjar Anahita Ohadi (SBN 358387)
Arthur McDonough (SBN 309695)
Yilei Huang (SBN 361829)
9800 Wilshire Blvd
Beverly Hills, CA 90212
Email: aohadi@rcornishlaw.com
Email: amcdonough@rcornishlaw.com
Email: yhuang@rcornishlaw.com
Tel: (213) 871-7788

*Counsels for Putative Class Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION**

| | |
|---|---|
| **RAGHAVA REDDY NALAMADA** and **ABILASH KUCHUKULLA**, on behalf of themselves and all others situated,<br><br>Plaintiffs,<br><br>v.<br><br>**GRANT KING,** an individual; **HOLLYWOOD INTERNATIONAL REGIONAL CENTER, LLC; HOLLYWOOD INTERNATIONAL REGIONAL CENTER TOMMIE LLC; 6516 TOMMIE LP,** both directly and derivatively**; 6516 TOMMIE HOTEL LLC; 6516 TOMMIE HOTEL HOLDINGS LLC; RELEVANT GROUP, LP; and COLONY CAPITAL, LP,**<br><br>Defendants. | Case No. 2:26-cv-02305<br><br>**CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiffs Raghava Reddy Nalamada ("Nalamada") and Abilash Kuchukulla ("Kuchukulla") (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendants Grant King ("King"), Hollywood International Regional Center, LLC ("HIRC"); Hollywood International Regional Center Tommie LLC ("HIRC Tommie"); 6516 Tommie LP, both directly and derivatively (the "Fund"); 6516 Tommie Hotel Holdings LLC (the "Borrower"); 6516 Tommie Hotel LLC (the "Project Owner"); Relevant Group, LP (the "Developer"); and Colony Capital, LP ("Colony") (collectively, "Defendants"), and allege as follows:

## OVERVIEW OF ACTION

1. Los Angeles has often been referred to as the "City of Illusion." In line with this reference was the illusion that a high-end, 200-room micro-lifestyle hotel in Hollywood could be developed and completed for a total cost of $59 million, begin construction by March 2018, and open during the summer of 2020, while producing a stabilized value of over $75 million within five years of opening and creating sufficient jobs to support up to 112 EB-5 investors. It could not. The Tommie Hotel project (the "Project") ultimately required close to $150 million in total financing and was foreclosed upon by a senior lender on or about February 28, 2023, resulting in a loss of the Project entity and leaving EB-5 investors without repayment of principal.

2. EB-5 immigrant investors trusted Defendants with their money not only to secure immigration benefits, but also to preserve and return their capital through a loan-to-equity structure. Instead, pervasive mismanagement, undisclosed conflicts of interest, and materially false and misleading statements infected the Project from inception. Defendants engineered a capital structure that was untenable, materially understated true development costs, lacked basic financial controls, and diverted investor attention through a steady cadence of "progress" updates that omitted cost overruns, financing gaps, and schedule slippage.

3. Plaintiffs and approximately 95 other investors around the world each invested at least $500,000 of at-risk capital (plus administrative fees) in 6516 Tommie LP (the "Fund"), based on offering materials and updates authored, approved, or disseminated by Defendants. Those materials included a Confidential Private Offering Memorandum dated April 28, 2016 (the "PPM"), a First Supplement dated February 28, 2018 (the "First Supplement"), a Business Plan with detailed budgets, a CBRE Hotels appraisal and market study, job-creation analyses, partnership and loan agreements, and subsequent investor communications.

4. As detailed below, numerous statements in those materials, and later updates regarding construction progress, budget, financing, valuation, job creation, and the use of investor funds, were materially false and misleading when made and omitted material facts necessary to make them not misleading. In violation of the federal securities laws, Defendants also concealed their motive to secure EB-5 capital as the linchpin for senior debt while masking the absence of internal controls, cost discipline, and project governance required for a development of this scope.

5. This action seeks rescission and/or damages under the Securities Exchange Act of 1934 (the "Exchange Act") and related state-law claims, as well as equitable relief, including an accounting. Plaintiffs also assert derivative claims on behalf of the Fund to recover assets wrongfully dissipated or transferred.

## JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and § 27 of the Exchange Act because Plaintiffs assert claims under Section 10(b) and Rule 10b-5, Section 20(a), and Section 29(b) of the Exchange Act.

7. Diversity jurisdiction independently exists under 28 U.S.C. § 1332(a)(2). The amount in controversy exceeds $75,000 exclusive of interest and costs, and Plaintiffs are diverse from one or more Defendants.

8. The Court also has supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367.

9. Defendants transacted business and committed acts in this District giving rise to the claims alleged herein. Venue is proper under 28 U.S.C. § 1391(b).

**PARTIES**

10. Plaintiff and representative of the class Nalamada is a citizen of India and resident of North Carolina, who invested $500,000 in the Fund on or about June 11, 2018, along with $30,000 of additional administrative fees wired to escrow.

11. Plaintiff and representative of the class, Kuchukulla is a citizen of India and resident of Texas, who invested $500,000 in the Fund on or about February 5, 2019, along with $30,000 of additional administrative fees wired to escrow.

12. Defendant 6516 Tommie LP (the "Fund") is a Delaware limited partnership formed to raise EB-5 capital and make a loan to 6516 Tommie Hotel Holdings LLC (the "Borrower) .

13. Defendant 6516 Hotel Holdings LLC (the "Borrower") is a Delaware limited liability company formed to contribute its proceeds to 6516 Tommie Hotel LLC (the "Project Owner").

14. Defendant 6516 Tommie Hotel LLC (the "Project Owner") is a California limited liability company formed to develop and construct the project, the Tommie Hotel. The Project Owner is also the job-creating enterprise for EB-5 process purposes.

15. The Project Owner and the Borrower are affiliates in the Project's structure and under the control of Defendants as described below.

16. Defendant Hollywood International Regional Center Tommie LLC ("HIRC Tommie") is the Fund's General Partner, as well as the Managing Member of the Project Owner, organized in Delaware with principal operations in Los Angeles, California. It is wholly owned and controlled by Defendant Hollywood International Regional Center, LLC ("HIRC").

17. Defendant HIRC is a Delaware limited liability company designated by USCIS as a regional center, with operations in Los Angeles County. At all relevant

times, HIRC, HIRC Tommie, and related entities were managed and/or controlled by Defendant Grant King ("King") and later non-party Victor Chen ("Chen").

18. Defendant Relevant Group, LP ("Relevant Group") is a California-based developer formerly known as Five Chairs Holdings, LLC. Relevant Group held itself out as the developer of the Project and related Hollywood hotel ventures. Relevant Group's managing member was King; Colony Capital, LP ("Colony") was a co-managing member and control person.

19. Defendant King is a principal of the Fund's General Partner and the Regional Center, and the managing member of Relevant Group. He signed project and fund documents, including partnership and loan documents, and approved offering materials and investor communications.

20. Defendant Colony is a control person of Relevant Group and, through its governance and financial oversight role, exercised control over Relevant Group with respect to the Project.

## NON-PARTY

21. Non-Party Victor Chen is an individual who, exerted influence over certain project finances and investor communications beginning in or around 2020 as a representative of migration agents and investors. His conduct is included solely as background relevant to Defendants' knowledge, control, and scienter.

## TOLLING ALLEGATIONS

22. Plaintiffs assert equitable tolling of applicable statutes of limitation due to Defendants' fraudulent concealment of material facts, their continuing misrepresentations and omissions through at least 2024, and their refusal to provide books and records necessary for investors to discover the truth concerning budget, cost overruns, schedule delays, financing gaps, and liens culminating in foreclosure.

## DERIVATIVE ALLEGATIONS (THE FUND)

23. Plaintiffs bring claims derivatively on behalf of the Fund to recover assets and proceeds wrongfully transferred or dissipated by control persons,

including King, Chen, and Relevant Group.

24. Demand is futile because King, Relevant Group, and later Chen controlled HIRC Tommie and the Fund and its controlling persons face substantial liability for the wrongdoing alleged. They have demonstrated hostility to transparency and refused reasonable information requests, rendering any demand futile or a useless formality. On information and belief, King has abandoned HIRC and not renewed its Regional Center licensure with USCIS.

## STATEMENT OF FACTS

25. The EB-5 immigrant investor program allows qualified immigrants to invest a minimum amount in a new commercial enterprise to create at least 10 full-time U.S. jobs per qualified immigrant and obtain conditional and then permanent residency. EB-5 regional centers like HIRC serve as the point of delivery for investor capital, oversight and count indirect jobs through accepted economic models.

26. Investors in the Fund were told their capital would be deployed "at risk" to finance the Project's development and construction, to be returned after immigration milestones or within a specified period, and that the Project would create jobs with a buffer above the count needed for all investors. ***See Exhibit "1"*** annexed hereto at p. 12

27. The PPM and Business Plan represented that total development costs for the Project were $59 million, including $29,501,000 in hard costs, $4,819,527 in soft costs, $6,942,000 in FF&E, $1,800,000 in development fee, $3,887,473 in office/administration/closing, and $12,050,000 for land acquisition, with a capital stack that included a minimum $20 million and up to $45 million in EB-5 funds, $18 million in developer equity (minimum), and an approximately $21–26 million senior construction loan. ***See Exhibit "1",*** supra, at pp. 8-9, 14, 16-17; and ***Exhibit "2"*** annexed hereto, the Business Plan, at Sections 1.2 and 7.2.

28. The Business Plan and CBRE appraisal projected "upon completion"

market value of approximately $69,200,000 as of April 1, 2019, and "stabilized" value of approximately $75,200,000 as of April 1, 2023. ***See Exhibit "2",*** supra, at Section 7.3, and ***Exhibit "3"*** annexed hereto, at Section V, pp. 26-27, 43.

29. The Business Plan included a detailed construction timeline representing that construction would commence in "*December of 2016*" and a "*completion in December 2018, and a Grand Opening planned for early 2019*". ***See Exhibit "2",*** supra, at Section 2.3. The First Supplement adjusted the expected construction commencement to be in March 2018. ***See Exhibit "4"*** annexed hereto at p. 2.

30. The Business Plan predicted job creation of 1,123 jobs—enough to support up to 112 EB-5 investors at 10 jobs per investor. ***See Exhibit "2",*** supra, at Section 1.2.

31. The CBRE appraisal further projected the subject Hotel reaching an 80% stabilized occupancy by 2021–2023. ***See Exhibit "3",*** supra, at Section IV, p. 32.

32. The First Supplement stated, among other things, that HIRC Tommie would acquire Geolo Selma 90mph Changeup LLC's membership interest in the borrower on March 1, 2018 and as such become the sole member and "responsible for all matters in connection with the Offering and the use of the Loan proceeds"; that the Project Owner was "currently seeking a senior construction loan […] of approximately $26 million"; and that it "believe[d] that it will obtain a Senior Loan by approximately September 2018," while cautioning there could be delays. ***See Exhibit "4",*** supra.

33. Investor-facing materials affirmed that EB-5 capital would be used "in its entirety, as per USCIS regulations, for the project's development budget," and that non-qualifying expenses (regional center fees, interest, origination costs, investor marketing, broker fees) would "be covered by administrative fees, developer equity, or other non-EB-5 sources." ***See Exhibit "2"*** at Section 7.1.

34. Defendants further represented or caused to represent to Plaintiffs and others that internal governance and financial controls would be in place, including maintenance of books and accounts, timely financial and tax reporting, banking oversight to prevent commingling, and controls appropriate for a hotel development of this size.

## PSLRA-PARTICULARIZED ALLEGATIONS OF FALSE AND MISLEADING STATEMENTS

35. The Private Securities Litigation Reform Act (PSLRA) requires Plaintiffs to specify each statement alleged to be false or misleading, the reasons why, and facts giving rise to a strong inference of scienter. Plaintiffs do so below, and further plead fraud with particularity under Fed. R. Civ. P. 9(b). For forward-looking statements, Plaintiffs allege that the "bespeaks caution" any statutory safe harbor do not apply because the statements were made without a reasonable basis and omitted material present facts, and because the cautions were generic and failed to disclose known, then-existing adverse facts.

36. Defendants delivered the Investor Packet, including the PPM, First Amendment, Business Plan, additional agreements and reports to the investors, including the plaintiffs, upon subscription of the investor to the project and when providing project updates. Therefore, Defendants purported the content of such documents to be true and as their own. Specifically, Defendant HIRC as the distributing Regional Center, HIRC Tommie as the Fund's General Partner and Grant King acting on behalf of HIRC and HIRC Tommie adopted the statements as their own through distribution of such documents to the investors. As such, defendants were the "speakers" of the specific statements, and the statements were made upon distribution of the documents to the investors.

37. Statements regarding Budget and Cost: The PPM dated April 28, 2016 stated that "[t]he aggregate funding requirements for the Project are approximately $59.0 million". ***See Exhibit "1"*** supra, at p. 8**.** The Business plan supplied with the

PPM repeated the $59 million total development cost with line-item detail (e.g., $29.5 million hard costs; $6.94 million FF&E). ***See Exhibit "2",*** supra, at Section 7.2.

38. The statements were false and misleading at the time they were made or caused to be made. Defendants materially underestimated costs from the outset despite contemporaneous information demonstrating that a 200-room, 7-story Hollywood hotel with below-grade parking could not be delivered at $59 million. Within 2019–2020, the Project's budget ballooned toward approximately $149 million—a more than 150% increase—without meaningful, timely disclosure to EB-5 investors explaining the variance, its drivers, or its impact on capital needs, liens, or schedule. The CBRE appraisal itself acknowledged that the developer's $59 million estimate excluded entrepreneurial profit and relied on cost inputs that Defendants knew were tight even before significant design evolution, escalation, and market shifts. ***See Exhibit "3",*** supra, at Section 5, p. 38-42. In light of Defendants' knowledge of comparable Hollywood projects and their own pipeline, the "$59 million" all-in budget lacked a reasonable basis.

39. Defendants had motive to publish a low budget to (i) render the pro forma and job-creation model attractive; (ii) facilitate EB-5 subscriptions and migration-agent placements; and (iii) secure a senior loan sized to a smaller perceived gap. Internal control weaknesses and lack of cost reporting enabled concealment of overruns. The rapid escalation of costs by 2019–2020, followed by liens and eventual foreclosure, supports a strong inference that Defendants knew or recklessly disregarded that the budget was unattainable when made.

40. <u>Statements Regarding Construction Start/Timeline and Progress</u>: The Business Plan, supported by a detailed construction schedule, and PPM represented that construction would begin in December 2016, "and be completed over approximately 28 months in April 2019," and "[t]he first full year of hotel operations [was] anticipated to be in 2020". ***See Exhibit "1",*** supra, at p. 18. The First

Supplement stated that "[t]he Project Owner believes […] to commence construction in March 2018". ***See Exhibit "4",*** supra, at p. 2. Subsequent investor updates between 2018–2019 reported construction "progress," approvals, and steps toward opening aligned to that timeline.

41. These statements were false and/or misleading when made or caused to be made. At the time these statements were caused or made, Defendants lacked the financing, trade buy-outs, and permits necessary to meet the schedule; they also failed to disclose contemporaneous disputes and change orders that jeopardized the timeline. The promised senior loan had not closed by the "approximately September 2018" target, and the capital stack remained incomplete even as Defendants reported or implied steady progress. Material schedule slippage ensued, and the hotel did not commence profitable operations as projected. By late 2020, the Project faced severe financial distress unrelated to COVID-19, including cost overruns and unpaid work, contradicting earlier progress assurances, but instead blamed virtually everything on COVID-19.

42. Defendants had motive to maintain the appearance of on-track construction to prevent redemptions, avoid investor complaints that could impede EB-5 processing, and keep leverage with lenders and contractors. Their intimate control over entitlements, financing, and construction supports a strong inference they knew the schedule was off track when they touted progress. Representations emphasizing COVID-19 ramifications were intended to lull investors into inaction, as full knowledge of their collective malfeasance and mismanagement would have caused investors to take action against them.

43. <u>Statements regarding Senior Loan Availability</u>: The First Supplement stated the Project Owner "believes" it would obtain an approximately $26 million senior construction loan by about September 2018. ***See Exhibit "4",*** supra.

44. The statement was false and/or misleading when made or caused to be made. While couched as belief, Defendants failed to disclose or caused the failures

to disclose that only a non-binding letter of intent had been obtained; no binding commitment existed; and Project underwriting increasingly depended on EB-5 capital deployment and milestones that were not achieved. The undisclosed reality was that delays in securing the senior loan and the potential for materially different or more expensive terms posed acute risks to cost-to-complete and schedule, which Defendants downplayed or omitted as they continued to solicit and accept EB-5 subscriptions.

45. Defendants had motive to create the impression of imminent senior financing to induce EB-5 closings and migration-agent placements and to buy time with contractors and the city. Their knowledge of the absence of a binding commitment and the Project's tightening economics supports scienter.

46. <u>Statements regarding Valuation</u>: The PPM, Business Plan and CBRE appraisal letter, included in the offering materials, reported an "upon completion" value of approximately $69.2 million as of April 1, 2019 and a stabilized value of approximately $75.2 million as of April 1, 2023. ***See Exhibit "1",*** supra, at p. 17; ***Exhibit "2",*** supra, at Section 7.3***;*** and ***Exhibit "3,"*** supra, at Section 5, pp. 26-27**.** Defendants highlighted those figures in presentations and updates as validation of Project economics.

47. The statements were false and/or misleading when made or caused to be made. The reported values rested on assumptions Defendants knew were already impaired: opening by 2019/2020; a $59 million all-in budget; a completed capital stack; and no extraordinary delays, disputes, or change orders. Defendants omitted material facts: the budget already showed pressure relative to comparable projects; the senior loan was not in place; and the Project was not on track to achieve the appraisal's conditions precedent. By continuing to tout these values without disclosing that assumptions had broken, Defendants through the communications they made or caused to be made rendered the valuation statements misleading.

48. Defendants had motive to use leveraged appraisal values to market the

Project and reassure investors, migration agents, and lenders. Their control over the underlying assumptions and knowledge of contrary facts supports scienter.

49. Statements Regarding the Use of EB-5 Funds and Internal Controls: Investor materials assured that EB-5 capital would be used entirely for the Project's development budget (qualifying expenditures) and that administrative fees, interest, and marketing would be paid from other sources. ***See Exhibit "2", supra,*** at Section 7.1**.** They also represented the maintenance of "books and accounts," annual reports, tax reporting, and banking oversight preventing commingling, with internal controls appropriate to a project of this size.

50. These statements were false and/or misleading when made or caused to be made. In practice, Defendants failed to implement and adhere to adequate internal controls and reporting. Books and accounts were not maintained in an organized manner; financial statements and tax documents were not timely or accurate; investors were provided phantom income on non-existent returns; and meaningful banking oversight was lacking to protect EB-5 proceeds in line with EB-5 regulations and offering terms. Defendants also authorized excessive "office and administration" and "developer fee" charges early in the life of the Project, depleting funds available for core construction.

51. Motive/Scienter: By minimizing transparency and weakening controls, Defendants preserved discretionary control over EB-5 funds and concealed the state of the Project. King and later Chen benefitted by retaining influence and fees while avoiding accountability for budget blowouts.

52. Statements Regarding Job-Creation Cushion and EB-5 Compliance: Materials claimed 1,123 total jobs, supporting up to 112 investors, with a job "cushion," and asserted Project compliance with EB-5 requirements through HIRC's sponsorship and job-creation modeling.

53. Why False/Misleading: The job-creation figures were predicated on (i) the $59 million construction budget; (ii) on time construction and opening; and (iii)

projected operating revenues in the early years. Defendants did not disclose that escalating costs, financing gaps, and schedule slippage undermined the core inputs necessary to sustain the job model, thereby eroding or eliminating any cushion.

54. Motive/Scienter: Defendants had motive to maintain a perception of a robust job cushion to secure and retain subscriptions. They knew or recklessly disregarded that the model's assumptions were compromised as costs escalated and schedules slipped.

55. Progress Updates 2018–2019: Defendants distributed investor updates indicating significant construction progress and steps "toward opening" while omitting that (i) the budget had ballooned; (ii) senior financing remained unresolved or on unfavorable terms; (iii) unpaid work and disputes with the general contractor and subcontractors had arisen or were mounting; and (iv) contingency and interest reserves were insufficient given cost-to-complete. ***See Exhibit "4",*** supra.

56. The statements are false and/or misleading. Each time Defendants updated or caused to update investors, they omitted material adverse facts needed to make statements they each caused or authorized about progress not misleading, including the magnitude of cost overruns and the resulting risk of liens and foreclosure.

57. Defendants had motive because they sought to avoid investor pushback and withdrawals, preserve immigration processing narratives, and forestall defaults by projecting confidence.

58. Statements of COVID-19 as Primary Cause of Failures: Post-2020 communications attributed financing failures and the inability to refinance or sell primarily to COVID-19 and credit-market shifts.

59. The statements were false and/or misleading when made or caused to be made. Although the pandemic affected hospitality assets generally, the Project's acute distress preceded COVID-19 and stemmed from foundational mismanagement: materially underestimated costs, missing senior financing,

inadequate controls, and deteriorating contractor relations. By attributing failure mainly to COVID-19, Defendants omitted that the Project was already off budget and schedule and burdened by governance failures.

60. Defendants had motive to recast causation to avoid liability for preexisting misconduct and to preserve EB-5 immigration narratives, thus lulling investors into inaction.

61. Construction Progress, Cost Overruns, and Contractor Disputes: Public records and litigation concerning the Tommie project reflect mounting mechanic's liens and disputes alleging unpaid work and mismanagement by the developer, culminating in foreclosure of 6516 Tommie Hotel, LLC by MIG Selma Ave Hotel LLC on or about February 28, 2023. By May 7, 2024, investors were informed that the Partnership did "not anticipate receiving further revenues or making distributions to Limited Partners," and that while a promissory note might yield proceeds only above a sale threshold, no repayment of the EB-5 loan would occur. These outcomes are irreconcilable with earlier "on-track" progress reports and projections of opening and stabilized performance by 2023.

62. Differences Between Estimates and Actuals—Funds, Time, Oversight: The differences between (i) the $59 million budget estimate and the nearly $150 million cost reality; (ii) the projected 28-month schedule to summer 2020 opening versus extended delays and financial failure; and (iii) the promised internal controls and oversight versus disorganized or missing books and delayed, inaccurate reporting, were material. Defendants failed to disclose these widening gaps contemporaneously, depriving EB-5 investors of decision-useful information regarding the Project's viability and the safety of their capital.

63. The PSLRA safe harbor does not apply because Defendants lacked any reasonable basis for their projections and omitted known present facts causing the projections to be misleading. Therefore, Defendants by virtue of their malfeasance and reckless conduct cannot claim any safe-harbor regarding these matters.

**STRONG INFERENCE OF SCIENTER UNDER THE PSLRA**

64. Defendants acted with scienter because they controlled all project entities and financial flows; they possessed contemporaneous knowledge of cost overruns, financing failures, contractor disputes, missing controls, and delayed schedules; they concealed adverse facts while promoting progress; they benefitted financially from continued subscriptions and fee extraction; they ignored red flags including escalating costs, liens, and lack of loan commitment.

**MISMANAGEMENT BY RELEVANT GROUP FROM THE OUTSET**

65. The Project was mismanaged at inception by Relevant Group and its principals. The initial cost model lacked realistic contingencies and excluded entrepreneurial profit, despite the complexity of a below-grade parking structure, a 7-story vertical build, and luxury finishes in a high-cost urban submarket. Relevant Group failed to implement internal controls and cost-management protocols befitting the Project's scale, including (i) rigorous budget-to-actual reporting, (ii) disciplined change-order governance, (iii) segregation of EB-5 funds and transparent draws, and (iv) timely lender alignment on cost-to-complete.

66. Relevant Group's failures extended to vendor and contractor management. General contractor and trade claims for unpaid work and delay costs reflect a breakdown in payment applications, schedule adherence, and dispute resolution. Rather than proactively addressing the capital shortfall and resetting scope and schedule, Defendants masked problems from investors and lenders and allowed cost exposure to spiral.

67. King's and Chen's roles presented conflicts and compounded mismanagement. [6] By wearing multiple hats across the Regional Center, Fund General Partner, borrower, and developer affiliates, they controlled both the flow of EB-5 funds and disclosures about their use, while lacking adequate independent oversight or audit.

68. Colony, as a control person of Relevant Group, exercised or had the

power to exercise control over Relevant Group's operations and Project decisions, including oversight of budgeting, financing, and risk management protocols. Colony's failure to implement appropriate controls or to correct known deficiencies supports control-person liability.

## LOSS CAUSATION, RELIANCE, AND DAMAGES

69. Plaintiffs and class members relied on Defendants' misrepresentations and omissions in investing $500,000 each in the Fund, reasonably expecting deployment into a viable development with a realistic budget, credible financing plan, appropriate controls, and truthful progress reporting.

70. The truth was revealed through a series of partial disclosures and events including but not limited to: contractor disputes and liens, including those with Suffolk Construction; missed schedules; and ultimately foreclosure in February 2023, followed by admissions in May 2024 that the Partnership would not receive repayment of the EB-5 loan and did not expect distributions. These revelations caused the decline in the value of investors' interests and the loss of return of capital.

71. Plaintiffs and class members have been damaged in an amount no less than their invested capital and administrative fees, plus consequential damages and interest, together with immigration-related harms.

72. Plaintiffs would not have invested but for Defendants' misrepresentations and omissions as asserted above.

## CAUSES OF ACTION

### COUNT I: RESCISSION UNDER § 29(b) OF THE EXCHANGE ACT

### (Against All Defendants)

73. Plaintiffs repeat and reallege the allegations above as if fully set forth herein. To the extent required, this claim is pled in the alternative.

74. Section 29(b) of the Exchange Act renders voidable any contract made in violation of the Exchange Act or the rules and regulations thereunder.

75. Defendants made or caused to make material misstatements and

omissions with scienter in connection with the offer and sale of limited partnership interests to Plaintiffs and the class, including (i) the Project's true budget and cost-to-complete; (ii) construction progress and schedule; (iii) senior loan status and availability; (iv) valuations premised on assumptions already broken; (v) the use of EB-5 funds and existence of adequate internal controls; and (vi) job-creation cushion and EB-5 compliance. These violations infected the Subscription Agreements, Limited Partnership Agreement, Loan Agreement, and related contracts.

76. Plaintiffs and the class reasonably relied on Defendants' misrepresentations and omissions to their detriment. All such agreements are voidable under § 29(b) and subject to rescission.

77. Plaintiffs seeks rescission and restitution of invested capital and administrative fees, together with interest, costs, and attorneys' fees as allowed.

**COUNT II: VIOLATIONS OF SECTION 10(b) AND RULE 10b-5; CONTROL-PERSON LIABILITY UNDER § 20(a)**

**(Against All Defendants)**

78. Plaintiffs repeat and reallege the allegations above as if fully set forth herein. To the extent required, this claim is pled in the alternative.

79. In connection with the offer and sale of securities, Defendants, directly and indirectly, by use of the means and instrumentalities of interstate commerce, employed devices, schemes, and artifices to defraud; made or caused others to make untrue statements of material fact and omitted to state material facts or caused such omissions necessary to make statements not misleading; and engaged in acts and practices that operated as a fraud and deceit upon Plaintiffs and the class, in violation of Section 10(b) and Rule 10b-5.

80. The materially false and misleading statements and omissions made or caused to be made include, but are not limited to, those particularized herein concerning cost, schedule, financing, valuation, job creation, use of funds, and internal controls. Defendants each acted with scienter, or at least with severe

recklessness amounting to scienter.

81. Plaintiffs and the class justifiably relied on the statements and omissions made or caused to be made by each of the Defendants and suffered damages when the truth emerged through cost escalation, schedule failures, liens, and foreclosure.

82. Defendants King, Chen, Relevant Group, and Colony exercised actual power or control over primary violators HIRC, HIRC Tommie, the Fund, and the Project entities, and are liable as control persons under § 20(a).

**COUNT III: BREACH OF FIDUCIARY DUTY**

**(Against All Defendants)**

83. Plaintiffs repeat and reallege the allegations above as if fully set forth herein. To the extent required, this claim is pled in the alternative.

84. Defendants owed fiduciary duties of loyalty, care, candor, and good faith to Plaintiffs, the class, and derivatively to the Fund, including duties to disclose material facts, implement adequate controls, manage conflicts, and safeguard investor capital.

85. Defendants breached their fiduciary duties by, among other things, disseminating false and misleading information; concealing cost overruns, financing gaps, schedule delays, and liens; failing to implement or follow internal controls; and engaging in conflicted decision-making.

86. As a direct and proximate result, Plaintiffs and the class suffered damages of no less than their invested capital and fees, plus consequential damages.

**COUNT IV: CIVIL CONSPIRACY**

**(Against All Defendants)**

87. Plaintiffs repeat and reallege the allegations above as if fully set forth herein. To the extent required, this claim is pled in the alternative.

88. Defendants agreed and conspired with one another to mislead investors, conceal material risks and conflicts, and mismanage the Project, thereby injuring

Plaintiffs and the class in their property interests. Each conspirator had an independent financial stake in the unlawful objective.

89. Plaintiffs and the class were damaged as a result of the conspiracy.

**COUNT V: DELAWARE CONSUMER PROTECTION ACT**

**(Against All Defendants)**

90. Plaintiffs repeat and reallege the allegations above as if fully set forth herein. To the extent required, this claim is pled in the alternative.

91. Defendants agreed that Delaware law would govern their conduct. Defendants engaged in unfair and deceptive acts and practices in violation of the DCPA by misrepresenting EB-5 compliance, job creation, cost and schedule, valuations, use of funds, and internal controls, and by omitting material facts.

92. Plaintiffs and the class suffered actual damages as a result and seek statutory and punitive damages where permitted.

**COUNT VI: MONEY HAD AND RECEIVED**

**(Against HIRC, HIRC Tommie, and Project Entities)**

93. Plaintiffs repeat and reallege the allegations above as if fully set forth herein. To the extent required, this claim is pled in the alternative.

94. Defendants received money belonging in equity and good conscience to Plaintiffs and the class pursuant to contracts infected by securities-law violations and fiduciary breaches. It would be unjust for Defendants to retain such funds.

95. Plaintiffs seek restitution, interest, and imposition of a constructive trust.

**COUNT VII: ACCOUNTING**

**(Against All Defendants)**

96. Plaintiffs repeat and reallege the allegations above as if fully set forth herein. To the extent required, this claim is pled in the alternative.

97. The financial relationships among Defendants and between Defendants and the Fund and Project entities are complex and opaque. An accounting is

necessary to determine the status and disposition of EB-5 funds, all transfers, fees, and the proceeds of any promissory note or sale.

**COUNT VIII: DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY ON BEHALF OF THE FUND**

**(Against King, Colony, and Relevant Group)**

98. Plaintiffs repeat and reallege the allegations above as if fully set forth herein. To the extent required, this claim is pled in the alternative.

99. Plaintiffs bring this claim derivatively on behalf of the Fund against its control persons for breach of fiduciary duties owed to the Fund, including duties of loyalty, care, and good faith.

100. Demand is excused as futile for the reasons previously stated herein.

101. King, Relevant Group, and Colony breached their fiduciary duties by concealing material facts, failing to implement controls, and mismanaging the Project, causing injury to the Fund.

102. The Fund suffered damages, including lost capital and business opportunities and exposure to liabilities. Plaintiffs seek recovery for the Fund.

**CLASS ALLEGATIONS**

103. Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of all persons who invested in the Fund. Excluded are Defendants, their affiliates, the Court and its staff.

104. All class members received the same offering documents and updates, including but not limited to the PPM, First Amendment, Business Plan, and Appraisals and relied on the same misstatements as Plaintiffs.

105. The class is so numerous and geographically diverse that joinder is impracticable; common questions predominate; Plaintiffs' claims are typical; and Plaintiffs will fairly and adequately protect the class with experienced counsel.

106. Common issues include whether Defendants (i) made or caused to make false or misleading statements or omissions; (ii) acted with scienter; (iii)

violated § 10(b)/Rule 10b-5 and § 20(a); (iv) breached fiduciary duties; (v) engaged in civil conspiracy; and (vi) caused class-wide damages. Therefore, liability arises from uniform written misrepresentations disseminated to all investors, making common questions far exceed individualized issues.

**STATEMENT OF COMPLIANCE WITH PSLRA PLEADING STANDARDS**

107. Plaintiffs plead securities fraud with particularity under Fed. R. Civ. P. 9(b) and the PSLRA by identifying (i) each specific false or misleading statement; (ii) the reasons why each was false or misleading; (iii) the speaker(s); (iv) when and where the statements were made; and (v) facts giving rise to a strong inference of scienter. To the extent any forward-looking statements are implicated, Plaintiffs allege that they were made without a reasonable basis and with knowledge of present facts that contradicted the projections, and that any cautionary language was inadequate and generic.

**REQUEST FOR APPOINTMENT OF RECEIVER**

108. As Plaintiffs have stated herein, HIRC has been abandoned by those charged with its operations. No one at HIRC will hold others to account so that the money of Plaintiffs and others like them similarly situated may be recovered. Likewise, without basic corporate controls in place, HIRC may be utilized for further activities that may injure Plaintiffs and those similarly situated. Given that risks of harm and further dissipation of assets are substantial, this Court should appoint a Receiver over HIRC to manage its corporate and financial affairs.

**DEMAND FOR JURY TRIAL**

109. Plaintiffs demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and others so similarly situated pray for class certification and judgment against the Defendants as follows:

1. Rescission of each of their $500,000 investments from the Project as

provided under common law and/or federal securities laws; or

2. In the alternative, judgment for the class against the Defendants for compensatory damages in an amount no less than $48 million, which includes return of all administrative fees paid to HIRC by all investors;

3. Imposition of a constructive trust or equitable lien on all assets or property owned or controlled by King, Chen, HIRC and Colony Capital attributable to the Plaintiffs and others so similarly situated;

4. A judgment against Defendants for their costs of suit incurred herein;

5. A judgment for any and all pre-judgment interest and post-judgment interest according to proof;

6. A judgment awarding punitive damages against Defendants as permitted by law in an amount to be determined according to proof at trial;

7. A judgment against Defendants awarding treble damages of at least $144 million or as may be permitted under relevant consumer protection laws, or punitive damages of the same amount;

8. For an accounting;

9. Attorneys' fees awardable under Exchange Act §29(b);

10. The immediate appointment of a Receiver over HIRC so that any judgment obtained in this case is not rendered ineffectual; and,

11. For such other and further relief as the Court deems just and proper.

Dated: March 4, 2026 **LAW OFFICES OF ROBERT V. CORNISH, JR., P.C.**

*/s/ Hadjar Anahita Ohadi*
Hadjar Anahita Ohadi
Arthur McDonough
Yilei Huang

*Counsel for Putative Class Plaintiffs*